**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

FELIPE DE JESUS CORONA-VERBERA,
            *Defendant-Appellant.*

No. 06-10538

D.C. No.
CR-91-00446-FRZ

OPINION

Appeal from the United States District Court
for the District of Arizona
Frank R. Zapata, District Judge, Presiding

Argued and Submitted
October 15, 2007—San Francisco, California

Filed December 7, 2007

Before: Robert R. Beezer, Stephen S. Trott, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Trott

**COUNSEL**

Andrea L. Matheson, Matheson Law Firm, P.C., Tucson, Arizona, for the defendant-appellant.

George Ferko, Assistant United States Attorney, Tuscon, Arizona, for the plaintiff-appellee.

**OPINION**

TROTT, Circuit Judge:

Felipe de Jesus Corona-Verbera ("Corona-Verbera") appeals his jury conviction and four concurrent eighteen-year sentences for (1) conspiracy to import cocaine in violation of 21 U.S.C. §§ 952(a), 960(a)(1), 960(b)(1)(B)(ii), and 963; (2) conspiracy to possess with intent to distribute marijuana and cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vii), 841(b)(1)(A)(ii)(II), and 846; (3) importation of cocaine in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 960(b)(1)(B)(ii), and 18 U.S.C. § 2; and (4) possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii)(II), and 18 U.S.C. § 2. We

must decide (1) whether a nearly five-year delay between events giving rise to the indictment and the return of the indictment constituted a due process violation; (2) whether, in spite of a nearly eight-year delay between the indictment and arrest, our government was diligent in searching for Corona-Verbera and bringing him to trial; (3) whether there was sufficient evidence to convict Corona-Verbera on all four counts; and (4) whether four concurrent eighteen-year sentences were unreasonable. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

# I

## BACKGROUND

The Sinaloa Cartel, led by Joaquin Guzman Loera ("El Chappo"),[1] was one of the largest drug trafficking organizations in Mexico during the late 1980s. One of El Chappo's "top aids," co-conspirator Angel Martinez-Martinez ("Martinez"), testified at Corona-Verbera's trial that the purpose of the Sinaloa Cartel was to obtain drugs, primarily cocaine, and smuggle the drugs into the United States for sale.

Corona-Verbera's current legal troubles stem from his involvement with the Sinaloa Cartel. The story, as it pertains to Corona-Verbera, began in May of 1990, when, as a result of a tip, United States Customs agents set up surveillance on a warehouse in Douglas, Arizona ("Douglas Warehouse"). The agents followed a flatbed truck from the Douglas Warehouse to a farmhouse complex in Queen Creek, Arizona ("Queen Creek Complex"). They maintained surveillance on the Queen Creek Complex for two days. During those two days of surveillance, law enforcement officials observed "flashes" emanating from inside one of the structures that they believed were caused by either welding or cutting with a torch.

---

[1]Also referred to as Chappo Guzman.

On May 11, 1990, agents obtained and executed a search warrant for the Queen Creek Complex. During the search, they discovered an empty false compartment underneath the bed of the flatbed truck they had followed from the Douglas Warehouse. The agents subsequently seized 2,037 pounds of cocaine from boxes in a building in the Queen Creek Complex.

Following the Queen Creek seizure, on May 17, 1990, the agents executed a search warrant at the Douglas Warehouse. To their surprise, they discovered a steel drainage grate in the floor covering a door disguised as a concrete plate. The door could not be opened manually, so agents used a jackhammer to break through it. Underneath, they found a tunnel.

The tunnel ("Douglas Tunnel") was approximately 200 feet long and ran from the Douglas Warehouse under the border to the home of Francisco Camarena-Macias ("Camarena") in Agua Prieta, Mexico. Martinez testified that Camarena was El Chappo's attorney. The concrete-lined tunnel was equipped with a cart similar to a miner's cart, electricity, a ladder, an air compressor system, a pulley system like that of an elevator, and tubular piping that was used to drain water from the tunnel.

On the Mexico side, the tunnel was accessed by activating a hydraulic system inside the Camarena residence. When the agents turned on what appeared to be a water spigot located outside of the house, the spigot activated the hydraulic system and raised a false sub-floor under a pool table, revealing the entrance to the tunnel.

At Corona-Verbera's trial, Martinez testified that one of the Sinaloa Cartel's primary entry points for smuggling drugs was the Agua Prieta, Mexico and Douglas, Arizona border. He said that to facilitate moving drugs from Mexico into the United States, El Chappo asked Corona-Verbera to build a tunnel between Agua Prieta and Douglas. Martinez testified

that El Chappo told him that "the architect Corona made me a f****** cool tunnel."

Martinez further testified he first met Corona-Verbera at El Chappo's residence in 1987. At that time, El Chappo introduced Corona-Verbera as "the architect Corona." Martinez said he "never saw anybody except architect Corona refer to Mr. Chappo Guzman in the informal 'tu.' " He testified also that Corona-Verbera had built other structures for El Chappo, and had previously used hydraulic systems to design hidden underground "clavos," or stashes, for El Chappo. Adalberto Romero ("Romero"), an employee at Douglas Redi-Mix in Arizona, testified that he received a shipment of equipment consisting of pistons "like a hydraulic lift," water pumps, and generators for delivery into Mexico. When he questioned Corona-Verbera and Camarena about the equipment, they told him it was for a gas station in Guadalajara, Mexico.

William Woods ("Woods"), a contractor who poured concrete at the Douglas Warehouse, testified that he had been Corona-Verbera's friend. He said Corona-Verbera was the architect at the warehouse and was at the site "throughout the whole construction." Woods said that Corona-Verbera told him that the warehouse was supposed to be a washbay for trucks. He testified also that Corona-Verbera told him that the drains Woods' crew had installed at the site were too small and to tear them out.

Woods' testimony was corroborated by Boniface Lomeli ("Lomeli"), a concrete construction worker at the warehouse, and by Romero, who continued to work for Douglas Redi-Mix after Camarena bought the company. Lomeli testified that Corona-Verbera told him the purpose of the warehouse was to wash trucks. However, there was no plumbing or water in the warehouse. Lomeli testified also that the drainage grates in the warehouse were too high for water to drain. Lomeli testified further that Corona-Verbera had him rip out otherwise functional two-by-two drains that had been

installed at the warehouse and replace them with two-by-four drains, regardless of the cost. The two-by-four drains concealed the door to the tunnel. Romero testified he told Corona-Verbera that there was no place for the drainage to actually drain, and Corona-Verbera told him it was none of his business and to pour the cement.

Shortly after the discovery of the tunnel, Corona-Verbera was charged in the District of Arizona on May 25, 1990, by complaint, with drug crimes, and a warrant was issued for his arrest.

The first indictment in this case was returned in 1988. On March 24, 1993, a federal grand jury returned a superceding indictment against others involved in the conspiracy, but still did not name Corona-Verbera as a defendant. On April 26, 1995, a federal grand jury returned a second superceding indictment. This indictment named Corona-Verbera as a defendant. A third superceding indictment also naming Corona-Verbera as a defendant was returned on August 8, 2001. Corona-Verbera was arrested in Mexico pursuant to a provisional arrest warrant on January 23, 2003. Extradition was granted to the United States on March 20, 2003.

Corona-Verbera's first appearance in court in the United States was on February 11, 2004. He subsequently asked for eight continuances, the first on March 4, 2004, and the last on October 7, 2005. On March 9, 2006, the district court judge denied Corona-Verbera's motions to dismiss for pre-indictment delay and violation of constitutional speedy trial rights. His trial began on March 14, 2006 and a guilty verdict was returned on March 29, 2006.

The pre-sentence report determined that Corona-Verbera's total offense level was forty. After applying a two-level enhancement because Corona-Verbera used his skills as an architect to facilitate the crime, the report recommended a sentence of 292 months due to the quantity of cocaine

involved. At the sentencing hearing on August 21, 2006, Corona-Verbera objected to the two-level enhancement and to the recommended sentence because of the disparity between his recommended sentence and those of his co-conspirators. In its discretion, the district court sentenced Corona-Verbera to four concurrent eighteen-year sentences, a downward departure of more than six years, based on the disparity in sentencing with respect to his co-conspirators. The district court awarded Corona-Verbera credit for time served dating back to his arrest in Mexico.

## II

## DISCUSSION

### A.  Pre-Indictment Delay

[1] "The Fifth Amendment guarantees that defendants will not be denied due process as a result of excessive preindictment delay." *United States v. Sherlock*, 962 F.2d 1349, 1353 (9th Cir. 1989). Generally, any delay between the commission of a crime and an indictment is limited by the statute of limitations. *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992). In some circumstances, however, "the Due Process Clause requires dismissal of an indictment brought within the [statute of] limitations period." *Id.*

[2] We review for abuse of discretion a district court's denial of a motion to dismiss for pre-indictment delay under the Fifth Amendment's Due Process Clause. *United States v. Barken*, 412 F.3d 1131, 1134 (9th Cir. 2005). In order to succeed on his claim that he was denied due process because of pre-indictment delay, Corona-Verbera must satisfy both prongs of a two-part test. First, he must prove "actual, non-speculative prejudice from the delay." *Huntley*, 976 F.2d at 1290. Second, the length of the delay is weighed against the reasons for the delay, and Corona-Verbera must show that the delay "offends those 'fundamental conceptions of justice

which lie at the base of our civil and political institutions.' " *Sherlock*, 962 F.2d at 1353 54 (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)). The second prong of the test applies only if Corona-Verbera has demonstrated actual prejudice. *Barken*, 412 F.3d at 1136. We have held that establishing prejudice is a "heavy burden" that is rarely met. *Huntley*, 976 F.2d at 1290. "Generalized assertions of the loss of memory, witnesses, or evidence are insufficient to establish actual prejudice." *United States v. Manning*, 56 F.3d 1188, 1194 (9th Cir. 1995). Consequently, Corona-Verbera must show both that lost testimony, witnesses, or evidence "meaningfully has impaired his ability to defend himself," and "[t]he proof must demonstrate by definite and non-speculative evidence how the loss of a witness or evidence is prejudicial to [his] case." *Huntley*, 976 F.2d at 1290.

Corona-Verbera argues that he suffered actual prejudice because the delay prevented him from: 1) tracking down witnesses or calling witnesses who died after the indictment to support his "mere presence" defense; 2) locating architectural plans showing what he was constructing in Agua Prieta; 3) producing destroyed financial records documenting his lawful earnings; and 4) having his expert examine the physical evidence that was not preserved, including the tunnel itself and a drain grate Corona-Verbera allegedly purchased.

**[3]** With respect to lost witnesses, Corona-Verbera's claim of prejudice fails for two reasons. First, the indictment was brought within the five-year statute of limitations. We have held that, generally, protection from lost testimony "falls solely within the ambit of the statute of limitations." *Sherlock*, 962 F.2d at 1354 (citations omitted).

**[4]** Second, Corona-Verbera's arguments are based on generalized speculation as to what lost or deceased witnesses would have said. He offers no affidavits nor any non-speculative proof as to how he was prejudiced by the loss of his witnesses. In *Sherlock*, we found no prejudice where the

record did not indicate how witnesses "would have testified had their memories not dimmed." *Id.* Similarly, when a defendant fails to make a specific showing as to what a deceased witness would have said, any argument of prejudice is pure conjecture. *Manning*, 56 F.3d at 1194. Furthermore, allegations of prejudice "must be supported by non-speculative proof." *United States v. Doe*, 149 F.3d 945, 949 (9th Cir. 1998). Consequently, Corona-Verbera has not established that the loss of potential witnesses constituted a meaningful impairment to his ability to defend himself.

Similarly, the mere absence of records is not enough to establish actual prejudice. *Manning*, 56 F.3d at 1194. In *Manning*, we declined to find prejudice when the defendant argued that the loss of access to credit card records could have explained his location at the time of the crime. *Id.* Corona-Verbera's argument that financial or architectural records would have established lawful income and work is not persuasive. Financial records could establish lawful earnings, but the mere existence of such records would not necessarily establish that Corona-Verbera had no unlawful income. Similarly, the existence of architectural plans showing construction of a legitimate residence would not be persuasive evidence establishing Corona-Verbera's innocence. Anyone designing an illegal drug tunnel would be unlikely to include drawings of such a tunnel on plans submitted to a government agency.

**[5]** Corona-Verbera's preservation of evidence argument stemming from the destruction of the tunnel is also not persuasive. "[W]here adequate substitutes exist for missing non-testimonial evidence, prejudice does not exist." *Barken*, 412 F.3d at 1135. Corona-Verbera has not established that the lack of preservation of the tunnel and the grate caused actual, substantial prejudice. His only argument is that his expert did not have an opportunity to examine them. This argument fails because the record contains numerous descriptions and photographs of the tunnel and the grate, and Corona-Verbera's claim that the pictures were inadequate is not convincing.

**[6]** We hold that the district court did not abuse its discretion in denying Corona-Verbera's motion to dismiss.**²**

## B.  Federal Rule of Criminal Procedure 48(b)

We review for abuse of discretion the denial of a motion to dismiss for pre-indictment delay under Federal Rule of Criminal Procedure 48(b). *Id.* at 1134. The district court denied Corona-Verbera's motion because there was no suggestion of purposeful or oppressive delay. *See United States v. Talbot*, 51 F.3d 183, 187 (9th Cir. 1995). However, we affirm the district court on different grounds: Rule 48(b) "clearly is limited to post-arrest situations." *United States v. Marion*, 404 U.S. 307, 319 (1971); *see also Barken*, 412 F.3d at 1136 ("Rule 48(b) comes into play only after a defendant has been placed under arrest."). Corona-Verbera's reliance on this rule to support his claim of unlawful pre-trial delay is misplaced.

## C.  Speedy Trial

**[7]** The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI. Once the accused demands a speedy trial, the government must "make a 'diligent, good-faith effort' to bring the accused before the court for trial." *United States v. Sandoval*, 990 F.2d 481, 484 (9th Cir. 1993) (quoting *Smith v. Hooey*, 393 U.S. 374, 383 (1969)).

We review de novo the district court's resolution of a claim under the Sixth Amendment's Speedy Trial Clause, but we will not overturn the district court's subsidiary factual find-

---

**²**Although we need not address the reasons for the delay because Corona-Verbera has not demonstrated actual prejudice, *Barken*, 412 F.3d at 1136, we note that he has failed to show that the delay was caused by the government attempting "to gain tactical advantage" over him. *Sherlock*, 962 F.2d at 1354 (quoting *Lovasco*, 431 U.S. at 795).

ings unless they are clearly erroneous. *United States v. Gregory*, 322 F.3d 1157, 1160 (9th Cir. 2003).

We assess the merits of Corona-Verbera's "claimed violation of the Sixth Amendment speedy trial right by applying a balancing test involving four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant." *Id.* at 1161 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

### 1. *Length of Delay*

**[8]** "The length of the delay is to some extent a triggering mechanism." *Barker*, 407 U.S. at 530. Most courts have found a delay that approaches one year is presumptively prejudicial. *Gregory*, 322 F.3d at 1161-62. We hold that the nearly eight-year delay between indictment and arrest is presumptively prejudicial and sufficient to trigger inquiry into the other three factors.

### 2. *Reason for Delay*

**[9]** We next address the reason for the delay. Whether or not our government is required formally to seek extradition and execute an arrest warrant when it believes extradition is futile is an issue of first impression in this Circuit. The Second Circuit addressed the issue in *United States v. Blanco*, 861 F.2d 773, 778 (2d Cir. 1988). In *Blanco*, the court held that seeking extradition of a defendant from Colombia would have been futile and "[d]ue diligence does not require the government to pursue goals that are futile." *Id.* We agree with the Second Circuit and hold that where our government has a good faith belief supported by substantial evidence that seeking extradition from a foreign country would be futile, due diligence does not require our government to do so.

In this case, the trial court found that:

> [T]he Government . . . presented evidence through the testimony of Agent Grant Murray, which was not refuted by Defendant's expert, that Mexico was not extraditing Mexican citizens on narcotics charges until the late 1990s, and while the Government did not cease its efforts to locate and arrest the Defendant, any efforts by the Government to extradite the Defendant earlier would have been futile.

**[10]** Agent Grant Murray testified that Corona-Verbera's name was put into the National Crime Information Center ("NCIC") computer system in 1990. Entries were kept also in the border computer system. When the 1995 superceding indictment was returned, that information was entered also into NCIC and the border computer system. These actions constitute diligence on the part of the government. *See United States v. Aguirre*, 994 F.2d 1454, 1455-57 (9th Cir. 1993) (upholding district court's finding that the government was diligent when the only action agents took was entering "stops" on defendant).

**[11]** In an attempt to locate Corona-Verbera and execute the arrest warrant by enlisting the help of the public, the government contacted Unsolved Mysteries and America's Most Wanted. Unsolved Mysteries aired a segment in the United States on the Douglas Tunnel twenty times between 1991 and 1997 and at least once in Mexico in 2000 or 2001. America's Most Wanted aired a segment on the Douglas Tunnel in 1996. The Unsolved Mysteries program contains a mug shot and narration regarding Corona-Verbera. Agent Murray testified Corona-Verbera's name was mentioned in both documentaries.

**[12]** Furthermore, the government offered testimony that it believed that seeking extradition of a Mexican national on drug charges during the 1990s would have been futile. This belief was backed by substantial evidence. Agent Murray testified that he contacted an Assistant United States Attorney

("AUSA") seeking a provisional warrant for Corona-Verbera, and that the AUSA informed him "the Mexican government was not extraditing nationals back to the United States." An expert for the defense agreed that from 1980 to 1996 no Mexican nationals were extradited to the United States. Finally, a United States Department of State ("DOS") report admitted at the motion hearing supports the government's assertion that extradition would have been futile. With respect to extradition from Mexico to the United States on drug charges, the report indicates that one Mexican national was extradited both in 1999 and 2000; eleven people were extradited in 2001; and seventeen people were extradited in 2002. Corona-Verbera was extradited in 2003 after Agent Murray received a tip in October of 2002 and obtained a provisional arrest warrant and an extradition. The DOS report supports the government's belief that very few people were extradited on drug charges from Mexico to the United States before 2002, the year when the government found Corona-Verbera. Consequently, if the government was not able to extradite Corona-Verbera, it also could not execute the arrest warrant.

Corona-Verbera argues that this case is like *Doggett v. United States*, 505 U.S. 647 (1992). On its facts, *Doggett* is distinguishable. In that case, the district court found the government's actions were negligent. The Supreme Court accepted the district court's determination of negligence which it reviewed "with considerable deference." *Id.* at 652. In Corona-Verbera's case, the district court did not find that the government was negligent, to the contrary.

**[13]** We conclude, as did the district court, that the government exercised due diligence in this case. Substantial evidence supports the government's assertion that extradition from Mexico on drug related charges prior to 2002 was extremely rare. The futility of extradition, combined with the government's entry of Corona-Verbera into NCIC and border stop computers, and the airing of the Most Wanted and Unsolved Mysteries segments, indicate that the government

did not simply forget about Corona-Verbera. Rather, after extradition became more likely in 2002, the government obtained an arrest warrant and diligently sought extradition. Consequently, the reason for delay weighs against dismissal.

### 3.   *Assertion of Right to Speedy Trial*

**[14]** Corona-Verbera asserted his right to a speedy trial only after he had asked for eight continuances, including one request after objecting to a continuance requested by the government. Because Corona-Verbera asserted his speedy trial right only after requesting numerous continuances, we find this factor weighs neither in favor of dismissal nor in favor of the government.

### 4.   *Prejudice to Corona-Verbera*

The remaining factor is prejudice. We have already concluded that the nearly eight-year delay between the indictment and arrest is presumptively prejudicial. "While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and its importance increases with the length of delay." *Doggett*, 505 U.S. at 655-56 (internal citations omitted). Therefore, we must "weigh the reasons for and the extent of the delay against the evidence of actual prejudice." *United States v. Beamon*, 992 F.2d 1009, 1013 (9th Cir. 1993) (citing *Doggett*, 505 U.S. at 656). If the government pursued Corona-Verbera "with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail" unless Corona-Verbera can show "specific prejudice to his defense." *Doggett*, 505 U.S. at 656.

**[15]** Corona-Verbera argues that under *Doggett*, he does not need to show specific prejudice because the government was negligent in pursuing him. We disagree. The district court found, and we agree, that the government's actions in pursu-

ing Corona-Verbera were diligent.[3] Consequently, Corona-Verbera is required to demonstrate specific prejudice; prejudice is not presumed. *See id.* at 656; *Manning*, 56 F.3d at 1194.

[16] One of the three traditional ways to show prejudice is by demonstrating that the defense was impaired. *Doggett*, 505 U.S. at 654. Corona-Verbera's arguments for prejudice here are the same as those he raised in his due process claim. We concluded above that Corona-Verbera has not demonstrated actual prejudice. We concluded also that the eight-year delay between the indictment and the arrest was due only to the futility of seeking extradition from Mexico of a Mexican national on drug charges. On balance, this factor weighs against dismissal because the government pursued Corona-Verbera with reasonable diligence, and, again, he has not demonstrated specific prejudice.

[17] Although the nearly eight-year delay from the time of the indictment to the time of arrest was lengthy, balancing the *Barker* factors, dismissal is not warranted. We therefore hold there was no violation of Corona-Verbera's Sixth Amendment speedy trial right.

## D.   Insufficiency of the Evidence

We review de novo claims of insufficient evidence. *United States v. Stanton*, 501 F.3d 1093, 1099 (9th Cir. 2007). "There is sufficient evidence to support a conviction if, 'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements

---

[3]Because we agree that the government was diligent, we do not find *United States v. Shell*, 974 F.2d 1035 (9th Cir. 1992), persuasive. In that case, we upheld the dismissal of an indictment based on a five-year delay between indictment and arrest. Unlike the present case, in *Shell*, the delay was caused by the government's negligent misplacement of the prosecution file, and therefore the appellant was not required to show actual prejudice. *Id.* at 1036.

of the crime beyond a reasonable doubt.' " *United States v. Deeb*, 175 F.3d 1163, 1168 (9th Cir. 1999) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Conflicting evidence is to be resolved in favor of the jury verdict, and "all reasonable inferences are to be drawn in favor of the government." *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201-02 (9th Cir. 2000).

### 1.  *Counts 1 and 2*

**[18]** The jury found Corona-Verbera guilty of conspiracy to import cocaine and conspiracy to possess with intent to distribute marijuana and cocaine. Corona-Verbera and the government both agree that a conspiracy existed. "Once the existence of a conspiracy is established, evidence which establishes beyond a reasonable doubt that a defendant is even slightly connected with the conspiracy is sufficient to convict . . . ." *United States v. Boone*, 951 F.2d 1526, 1543 (9th Cir. 1991). A defendant may be "slightly connected" even if he did not know all the conspirators, did not know all the details of the conspiracy, did not participate in the conspiracy from the outset, and did not participate in all the enterprises of the conspiracy. *See United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001). Additionally, circumstantial evidence that the defendants acted with a common goal is sufficient also to prove agreement, and agreement may be inferred from conduct, express agreement is not necessary. *United States v. Hegwood*, 977 F.2d 492, 497 (9th Cir. 1992).

Corona-Verbera argues that he was "merely present" and had no knowledge of this conspiracy. Therefore, we must determine whether there is sufficient evidence to tie Corona-Verbera to the criminal activities. *Herrera-Gonzalez*, 263 F.3d at 1095. We have explained that "[t]he mere presence of a defendant in suspicious circumstances is not enough to imply knowledge." *Hegwood*, 977 F.2d at 498. Additionally, mere presence "at the location of a conspiracy's activities, while the activities are taking place, knowing that they are

taking place, without proof of intentional participation in the conspiracy, cannot support a conspiracy conviction." *Herrera-Gonazalez*, 263 F.3d at 1097.

[19] Here, there was sufficient evidence for a reasonable juror to find that Corona-Verbera intentionally participated in the conspiracy and was more than "merely present" at both the ingress and egress of the tunnel. Corona-Verbera was an active participant in the construction of both Camarena's residence and the warehouse. Various witnesses identified Corona-Verbera as the architect at both sites, reflecting that he was more than "merely present." Thus, a reasonable juror could have concluded that Corona-Verbera had control over both sites as the architect.

Further, although Corona-Verbera denies any knowledge of the drug conspiracy and consequently the tunnel, there is considerable evidence to the contrary. Jesus Garcia ("Garcia"), a contractor and roofer working on the Camarena home, testified that "Corona was the architect for the whole project." During construction of the Camarena home, there was a four-foot hole filled with sand and gravel where the recreation room at the Camarena house was supposed to be. Garcia was told by an unknown person that the hole was eventually going to be an Olympic sized swimming pool. However, when agents discovered the tunnel, there was no swimming pool, instead there was a tunnel, accessed through the recreation room of the Camarena home. A reasonable juror could have concluded the swimming pool story was a cover, and that as the architect for the residence, Corona-Verbera perpetuated that story to hide the fact that the hole was actually the entrance to the tunnel.

Lomeli, Woods, and Romero testified that Corona-Verbera told them the purpose of the warehouse was to wash trucks. However, there was no plumbing or water in the warehouse. Lomeli and Romero testified also that the drainage grates that concealed the tunnel's egress were too high for water to drain.

Lomeli and Woods testified further that Corona-Verbera had them rip out otherwise functional two-by-two drains that had been installed at the warehouse and replace them with two-by-four drains, regardless of the cost. The two-by-four drains covered the access to the tunnel. A reasonable juror could have concluded from this testimony that Corona-Verbera knew that the warehouse was not designed to wash trucks, and that his orders to tear out the drains indicated he knew that the drains were not large enough to bring drugs out of the tunnel.

The tunnel entrance at the Camarena's home was opened by activating a hydraulic system. Romero testified he delivered pistons "like a hydraulic lift," to Corona-Verbera and Camarena. Martinez testified that in the past, Corona-Verbera built or repaired other structures for El Chappo equipped with hydraulic systems concealing hidden "clavos." Several warehouses and complexes owned by El Chappo had similar devices in the floor that hid underground rooms. Martinez testified that El Chappo said he asked Corona-Verbera to build the tunnel. Martinez further testified that Corona-Verbera and El Chappo were close enough acquaintances that Corona-Verbera referred to El Chappo with the familiar "tu" instead of the formal "usted." If the jury believed Martinez and Romero, it reasonably could have concluded that Corona-Verbera designed the tunnel using hydraulic lifts similar to former designs for El Chappo, that Corona-Verbera had a close relationship with El Chappo, and that Corona-Verbera knew the tunnel he designed was going to be used for smuggling drugs.

Corona-Verbera argues that Martinez's "uncorroborated" testimony is the only testimony linking Corona-Verbera to the conspiracy. During the trial, Corona-Verbera's attorney extensively questioned Martinez about his prior conflicting testimony, and the jury heard it all. A reasonable juror could have accepted some parts of Martinez's testimony as true and rejected others. *See United States v. Heredia*, 483 F.3d 913,

923 n.14 (9th Cir. 2007) (en banc). Additionally, much of Martinez's testimony was corroborated in part by circumstantial evidence and other witnesses including Corona-Verbera's friend, Woods.

[20] Taken together, viewed in the light most favorable to the prosecution, we hold there was enough evidence for a reasonable juror to find Corona-Verbera was more than "merely present," and he intentionally participated in the conspiracy. We affirm as to counts 1 and 2.

### 2. *Counts 19 and 20*

[21] Counts 19 and 20 relate to the seizure of the cocaine from Queen Creek on May 11, 1990. Three legal theories can support a conviction for possession with intent to distribute: aiding and abetting, co-conspirator liability, and dominion and control. *United States v. Ramirez-Robles*, 386 F.3d 1234, 1240 (9th Cir. 2004). We hold there is sufficient evidence to uphold Corona-Verbera's conviction as an aider and abetter.

A conviction for aiding and abetting requires the government to prove that Corona-Verbera associated himself with the venture, "that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *Id.* at 1241. A conviction may not be upheld based on "mere casual association with conspiring people." *Id.* (internal quotation marks omitted). Circumstantial evidence may support a conviction as an aider and abetter. *Id.*

[22] We have concluded from the record that a reasonable juror could have found that Corona-Verbera participated in an international drug conspiracy when he designed the Douglas Tunnel. The purpose of the tunnel was to bring drugs into the United States from Mexico. Thus, Corona-Verbera participated in a venture that he wished to bring about, and in designing the tunnel, he sought to make the venture succeed.

**[23]** There was also sufficient circumstantial evidence that the drugs seized at Queen Creek were imported into the United States through the tunnel and transported to Queen Creek in the flatbed truck followed by government agents. Agents followed the flatbed truck from the Douglas Warehouse located at the tunnel egress. Agents testified they observed flashes of light from the Queen Creek Complex and later discovered that the truck they followed from the warehouse had a hidden compartment, which was opened with a welding torch. In fact, when they found the truck, the hidden compartment was exposed and the false bed laid over the top of it. Martinez testified that El Chappo told him a large shipment of drugs had been seized by the United States after the drugs had been brought into the United States through the tunnel. A reasonable juror could have concluded, based on the testimony of law enforcement and Martinez, that the drugs located at Queen Creek were imported from Mexico into the United States through the tunnel; that the drugs were loaded into the flatbed truck at the warehouse; and that the flashes of light observed by agents were the false bed being removed so the drugs could be taken from the flatbed truck.

**[24]** Furthermore, around the same time the drugs were seized, Corona-Verbera and his family disappeared from their trailer in Douglas, and the school records for Corona-Verbera's children show they were absent beginning on May 11, 1990, the day the cocaine was seized. A reasonable juror could have concluded Corona-Verbera knew that the seized cocaine was transported through the tunnel and knew also that he was in danger of being arrested for his involvement in importing drugs. Viewed in the light most favorable to the prosecution, a reasonable juror could have found Corona-Verbera guilty on counts 19 and 20, and we so hold.

### E.   Sentencing

After *United States v. Booker*, 543 U.S. 220 (2005), we no longer review sentences imposed by a district court de novo.

*Booker* replaced the de novo standard of review "with an abuse-of-discretion standard that we called 'reasonableness.' " *Rita v. United States*, 127 S. Ct. 2456, 2470 (2007) (Stevens, J., concurring). We review for clear error the district court's factual findings. *United States v. Kimbrew*, 406 F.3d 1149, 1151 (9th Cir. 2005). Finally, we review for abuse of discretion a district court's determination that a defendant's particular abilities constitute a "special skill" because it is an application of law to the facts. *Id.* at 1151; *United States v. Lee*, 296 F.3d 792, 795 (9th Cir. 2002).

Corona-Verbera raises three arguments regarding his four concurrent eighteen-year sentences: 1) the sentence was grossly disproportionate to the sentences imposed on co-conspirators Martinez and Camarena; 2) the district court's factual findings that he used his special skill as an architect to facilitate the crimes were erroneous because there is no evidence that Corona-Verbera used his skills as an architect; and 3) an eighteen-year sentence is tantamount to a life sentence, in violation of the United States-Mexico Extradition Treaty and the terms of the extradition agreement. We disagree.

### 1. *Sentence Disparity*

Corona-Verbera argues that his sentence was grossly disproportionate to those of his co-conspirators, Camarena and Martinez. Unlike Corona-Verbera, Camarena entered a guilty plea and accepted responsibility. He was sentenced to ten years. Likewise, Martinez entered a guilty plea, accepted responsibility, and agreed to cooperate with the government and testify against his co-conspirators. He was sentenced to eighteen years.

We assess whether the ultimate sentence is reasonable in light of the factors in 18 U.S.C. § 3553(a). *United States v. Nichols*, 464 F.3d 1117, 1124 (9th Cir. 2006).

> To comply with the requirements of *Booker*, the district court must have sufficiently considered the

> Guidelines as well as the other factors listed in § 3553(a). This requirement does not necessitate a specific articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence.

*United States v. Knows His Gun*, 438 F.3d 913, 918 (9th Cir. 2006). "[T]he need to avoid unwarranted sentencing disparities is only one factor a district court is to consider in imposing a sentence." *United States v. Marcial-Santiago*, 447 F.3d 715, 719 (9th Cir. 2006).

**[25]** Corona-Verbera has not demonstrated that the district court overlooked any of these factors. Furthermore, the district court considered at length the disparity between Corona-Verbera's sentence and those of his co-conspirators. The court found that the disparity warranted a variance "substantially below the advisory guideline." Consequently, the court imposed a sentence seventy-six months *below* the applicable Guideline range. We hold that the disparity in sentencing here was not so disproportionate as to render the eighteen-year sentence unreasonable.

### 2. *Special Skills Enhancement*

The Sentencing Guidelines allow a district court judge to impose a two-level sentence enhancement if the defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. A "special skill" is "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. § 3B1.3. cmt. 4.

We apply a two-part test to determine whether or not a skill constitutes a "special skill" within the meaning of the guidelines. *Lee*, 296 F.3d at 798. First, we determine whether the

skill is possessed by members of the general public. *Id.* Second, we determine whether the skill requires substantial training, education or licensing, and is analogous to the skills described in the application note. *Id.* at 798-99. We have held that cheating at cards does not constitute a special skill because it is useless outside the criminal context. *United States v. Liang*, 362 F.3d 1200, 1203 (9th Cir. 2004). We have held also that driving an eighteen-wheeler without mishap over a period of several years does constitute a special skill because it is a skill well beyond that possessed by the general public. *United States v. Mendoza*, 78 F.3d 460, 465 (9th Cir. 1996).

**[26]** Corona-Verbera was an architect. This is a legitimate skill outside of the criminal context, and it is not a skill possessed by the general public. The district court found, based on the jury verdict, that because of his skills as an architect, Corona-Verbera was hired to build the Douglas Tunnel, the Camarena home, and the Douglas Warehouse. This finding was not clearly erroneous, nor was the application of these facts to the law an abuse of discretion in light of the evidence presented at trial that the tunnel was highly sophisticated. The tunnel was lined with concrete; accessed with a hidden hydraulic system; and equipped with electricity, a pulley system like that of an elevator, an air compressor system, and tubular piping used to drain the tunnel of water. Furthermore, because all require substantial education, the skill of an architect is analogous to those of pilots, lawyers, doctors, accountants, and demolition experts. We affirm the special skills enhancement.

### 3. *Extradition Agreement and Treaty Violation*

The specific agreement between the United States and Mexico to extradite Corona-Verbera contains a binding assurance from our Ambassador to Mexico that the United States will neither seek nor impose a death sentence or life imprisonment. Predicated upon this assurance, Corona-Verbera argues

that because he is fifty-three years old, his eighteen-year sentence is "tantamount to a life sentence" in violation of the terms of his extradition. He intermingles with this argument an assertion that a life sentence constitutes "cruel and extreme punishment," and that Articles 18 and 22 of the Mexican Constitution prohibit the imposition of punishment that can be so characterized. He argues also that because a life sentence constitutes cruel and extreme punishment, it violates the United States-Mexico Extradition Treaty. Corona-Verbera attempts to support these arguments with a decision of the Supreme Court of Mexico holding that Mexico will not extradite suspects facing a life sentence on the ground that life imprisonment constitutes "unusual or extreme punishment." *See* Rodrigo Labardine, *Life Imprisonment and Extradition: Historical Development, International Context, and the Current Situation in Mexico and the United States*, 11 Sw. J. L. & Trade Am. 1, 52 (2005). We find these inventive arguments not convincing.

**[27]** Neither our Ambassador's letter nor the Treaty itself mention any prohibition against a sentence imposing a precise term of years. Likewise, no mention is made of "unusual or extreme punishment" or any equivalent thereof. *See* Extradition Treaty Between the United States of America and the United Mexican States, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059. Accordingly, the simple answer to Corona-Verbera's argument is that he was not sentenced to life in prison. He was sentenced to eighteen years in prison, with credit for more than four years served. Moreover, his projected release date is at the age of sixty-four.

### III

### CONCLUSION

Corona-Verbera has not demonstrated actual prejudice with respect to his claims of unlawful delay. The government was diligent in its efforts to bring Corona-Verbera to trial and was

not required to seek extradition from Mexico when it believed extradition was futile. Therefore, Corona-Verbera's Sixth Amendment claim fails. There was sufficient evidence for a reasonable juror to convict Corona-Verbera on counts 1, 2, 19, and 20. Finally, the eighteen-year sentence was reasonable and did not violate any treaty obligations or the terms of the extradition agreement.

**AFFIRMED**