**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Gilbert MENDOZA, Defendant–Appellant.**

No. 95–50110.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 5, 1996.

Decided March 11, 1996.

James P. Walsh, Assistant United States Attorney, Los Angeles, California, for plaintiff-appellee.

Donald C. Randolph, Santa Monica, California, for defendant-appellant.

Fed.R.App.P. 38.

Before: BEEZER, BRUNETTI and JOHN T. NOONAN, Jr., Circuit Judges.

NOONAN, Circuit Judge:

Gilbert Mendoza pleaded guilty to a charge of conspiracy to distribute cocaine in violation of 21 U.S.C. § 841 and to a charge of possessing with intent to distribute 42,000 pounds of cocaine in violation of 21 U.S.C. § 841(a)(1). He reserved the right to appeal a denial of his *Kastigar* motion and to appeal his sentence. We affirm his conviction and remand for reconsideration of his sentence.

## FACTS

On October 3, 1989 at approximately 2:00 p.m. Mendoza was arrested in Hollywood, California by a team of local police officers. He was informed that he was charged with possession of cocaine with intent to distribute. Advised of his constitutional rights, he stated that he understood them and declared that he was willing to answer questions without the presence of a lawyer. He was interviewed by task force officer Dean Caputo and DEA Special Agent John Emerson, who asked him to explain how he became a driver for "the organization." He declared that he had been approached by Hector and Carlos (persons known to the agents as Hector Tapia–Anchondo and Carlos Tapia–Ponce), who in 1986 asked him to drive a tractor-trailer for them. He said that he would pick up the vehicle on Bradley Street in El Paso, Texas after being called by Hector Tapia–Anchondo and would drive it to the Los Angeles area. He stated that he was paid $11,000 per trip and had made "countless" trips from Texas to California in the last three years. He said that there was no co-driver. He said that he had taken the trailers to three different warehouses in the Los Angeles area, including a warehouse in Sylmar and a warehouse in Sherman Oaks. He would carry boxes of pottery and paintings which never changed:

the items, in fact, were never unloaded. He had suspected that there was something suspicious about what he was doing.

At the Huntington Park Police Department Mendoza was interviewed the same day by DEA Special Agent James Capra, who was the case agent, and by Detectives William Huffman and D.J. Fitzgerald of the Huntington Park Police Department. Fitzgerald asked Mendoza if he understood his constitutional rights and Mendoza answered yes and stated that he was willing to talk. He repeated that he had been hired by Hector and Carlos and was paid $11,000 to drive a loaded tractor-trailer from El Paso to Los Angeles, adding that his profits ran from $9,000 to $10,000 per load and that he made four trips per month from El Paso to Los Angeles. He also stated that the tractor-trailer had been purchased by Hector for $52,000 in cash, but the vehicle was registered in Mendoza's name because Hector was illegal. He identified Hector and Jose Manuel Vasquez by photograph.

Mendoza declared that he always took the same merchandise back and forth on these trips. On the way from El Paso to Los Angeles the fifth wheel was unusually heavy whereas returning the same merchandise to El Paso the fifth wheel was noticeably lighter. After he picked up the loaded trailer in El Paso Hector Anchondo would have four or five vehicles follow the trailer over a distance of several hundred miles. Anchondo and Manuel Vasquez would drive ahead of the trailer and inspect the checkpoints and scales to insure that narcotics-sniffing dogs were not present at them. Anchondo told Mendoza to avoid tractor-trailer scales and on numerous occasions Mendoza would alternate the route to avoid the scales. After clearing the checkpoints Anchondo would give Mendoza new manifests showing the loads of merchandise had originated from New Mexico and not El Paso. Anchondo would sign the bills of lading under the name "Tom Lee." Anchondo would place new magnetic signs on the sides of the trailer. On arrival at the warehouse in the Los Angeles area Mendoza would drop off the tractor-trailer and would be taken to a hotel, usually by Carlos Tapia or one of the Tapias' associates.

Mendoza would stay at the hotel for two or three days and then be called by Tapia or Anchondo to pick up the tractor-trailer.

Mendoza stated that he had last seen Hector two weeks ago at Hector's house in El Paso and mentioned a white building there on Bradley Street with the name "Lopez Imports." He also mentioned a Carlos Anchondo who was the father and a Carlos Anchondo who was the son. He stated that he had a blue car in his name that actually belonged to Hector. He mentioned "Ruidoso" and "Ruidoso Arts and Crafts." He also gave the names of "Hugo" and "Jimmy" and "Mario" and "Bobby." He provided a number of telephone numbers which the detectives wrote down. He identified one "Ponchito," who took care of the property at Canutillo, Texas which was the "location of the organization" where there were vehicles, motorcycles, a bulldozer and two mobile homes. He gave exact directions how to reach this place.

On October 4, 1989 Mendoza was further questioned by Detectives Dominguez and Key of the Southgate Police Department. He told the same story of being offered a job to drive a trailer for Hector and Carlos, adding that he first did it driving for them from Ruidoso, Texas to El Paso, Texas and being paid $1,500 for this run. After six months Hector and his associates offered him a regular job with their association to be their sole driver, adding that they would buy him a tractor-trailer. He continued to make runs for them within Texas, being paid $3,000 for each round trip and at Hector's direction avoiding the scales. After a period he was asked to make the trips from El Paso to Los Angeles for $11,000 per trip. He told the same story he had told the other officers about the El Paso to Los Angeles trips, and he repeated how associates of Hector "would drive by him in Jaguars, Mustangs or BMWs and that they would instruct him to wait there as they drove through the scales or border stops just to see if there were any narcotic-sniffing dogs at those sites." After he got past the checkpoints one of the associates would change the magnetic signs on the side of his truck to show a different company name. He was always paid in cash by Hector, always paid before his departure and always given extra money for expenses.

Detective Dominguez, Sergeant Key and Detective Affeld then drove Mendoza so he could show them different warehouse locations to which he had driven his trailer. Two of these warehouses he identified as having belonged to Hector and his associates. The third location Dominguez found had been registered to Tapia–Ponce. A fourth location Mendoza said belonged to Hector and he had been told that it was "the emergency location."

On October 5, 1989 Mendoza appeared in state court for his first appearance on the state charges. He was assigned Rita Smith, Deputy Public Defender, to defend him. She entered into an agreement with Los Angeles County Deputy District Attorney Court Hazell which provided that anything Mendoza said to officers after October 5, 1989 "would not be used against him." The agreement expressly did not apply to earlier statements by Mendoza. On October 25, 1989 DEA agents Capra, William Sherman and Mark Trouville, visited Mendoza at the Huntington Park jail. Rita Smith agreed that they could ask him about the case. Mendoza declined to talk with the agents until he spoke with the federal prosecutor. On November 3, 1989, Assistant United States Attorney Walsh, who was in charge of the federal case, Special Assistant United States Attorney Susan Bryant–Deasan, Sergeant Huffman and Rita Smith met with Mendoza at the jail to discuss whether he would cooperate with the federal government. Mendoza telephoned a member of his family and then informed this group that he was terminating his cooperation.

## PROCEEDINGS

On November 28, 1989 Mendoza was federally indicted along with Hector Anchondo and several others. On December 4 he was arrested by federal agents. On December 11 he was arraigned and pled not guilty; counsel was appointed to represent him in the federal case. On June 13, 1990 Mendoza moved to suppress statements he claimed to have made to the authorities after October 5, 1989.

On November 21, 1991 Mendoza was arraigned on the third superseding indictment, charging him with the counts to which he ultimately pleaded guilty. The defendants also charged as conspirators on count 1 were Hector Tapia–Anchondo, Hugo Fernando Castillo Alvarez, Miguel Chavez, and Alexander Herrera. The conspiracy charged was establishing a network including individuals and businesses in El Paso, Texas, Ruidoso, New Mexico, and Los Angeles for the purpose of distributing cocaine in the Los Angeles area. Unindicted coconspirators Tapia–Ponce was charged with establishing Fiesta Arts and Crafts with a warehouse in Sylmar, California where large amounts of cocaine were stored after their delivery by tractor-trailer from El Paso. Unindicted coconspirators James McTague and Mauricio Monroy were said to have maintained the inventory and records at the Sylmar warehouse. Mendoza was specifically charged with driving the cocaine by truck from El Paso to Los Angeles using false bills of lading and using shipments of arts and crafts materials as a cover for the cocaine.

On May 4, 1992 Anchondo moved to sever his trial from that of Mendoza; the motion was granted, and Mendoza's trial was ordered to trail that of his codefendants. On December 22, 1992 the codefendants were found guilty on all counts. Mendoza received copies of the transcripts of the trial.

Meanwhile, Carlos Tapia–Ponce, McTague and Monroy had been tried and convicted on charges of conspiracy and possession of cocaine with intent to distribute. The facts in that case are summarized in *United States v. Ponce,* 51 F.3d 820, 825 (9th Cir.1995). According to what was established in their trial, the cocaine was flown by the Medellin cartel from Colombia to Chihuahua, Mexico and stored in Juarez, Mexico. It was trucked into the United States and stored at several locations in El Paso. It was then hidden in secret compartments of tractor-trailers and shipped in multi-ton deliveries to the warehouse in Sylmar. Ledgers in the warehouse showed that, during the three-month period from June to September 1989, the Sylmar warehouse received 77 tons of cocaine. When a search warrant was executed at the warehouse on September 28, 1989 the agents found boxes containing 21.4 tons of cocaine with a street value of $6.9 billion.

Carlos Tapia–Ponce was the patriarch of this family smuggling business and oversaw its operation. He was assisted by his two sons, Hector Tapia–Anchondo and Carlos Tapia–Anchondo, and by his sons-in-law, McTague and Monroy. Also, according to the record in *Ponce,* he was assisted by "the organization's principal driver, Gilbert Mendoza." *Ponce,* 51 F.3d at 825.

On November 15, 1993 the district court held an evidentiary hearing on Mendoza's *Kastigar* motion, a hearing that continued on to January 10, 1994. Mendoza submitted a declaration that he had been interviewed during the period after October 5, 1989 while he was in the Huntington Park jail, by Detective Fitzgerald, DEA Agent Capra, Agent Sherman, Detective Huffman, AUSA Walsh and AUSA Bryant–Deasan. He stated that he provided then relevant information on the subjects of Russo Garcia; Jay; Ruidoso Firewood; Carlos's home in Ruidoso; McTague's home in El Paso; Hector Tapia–Anchondo's property in Mexico; Hector Tapia–Anchondo's safe under the pool table; the Tapias' ranch in Mexico; Alex; and truck stops. Mendoza also testified at the hearing that he was interviewed four to six times by Edgardo Curbello, a custodian at the Huntington Park jail who brought Mendoza his food from a restaurant, supplied him with his chewing tobacco and took him to make his phone calls. Mendoza testified that he had told Curbello how many trucks the people had, where they lived, how he was paid, and whether he loaded the trailer. He also said that he had discussed magnetic signs with Curbello, the routes he drove between El Paso and Los Angeles, people in the organization, and warehouses in Dallas, El Paso and Los Angeles. At another meeting with Curbello, according to Mendoza, he discussed customs procedures at the border, a construction company the Tapias owned, and a bulldozer the Tapias bought in El Paso.

All of the persons named by Mendoza as having received information from him about the case denied under oath that they had discussed the case with him during the peri-

od after October 5. AUSA Walsh declared that he had instructed the government's agents not to discuss the case in any way. There was a conflict between Mendoza's declaration and testimony and the testimony of all of the persons that he named. Mendoza tried to overcome this defect by getting Capra and Fitzgerald to admit that some of the topics listed in the preceding paragraph were topics that Mendoza had mentioned to them which were not found in Fitzgerald's notes or in Capra's report of the October 3 debriefing of Mendoza. The defense argued that if the officers remembered hearing about these things from Mendoza, while there was no mention of them in the officers' notes, the information must have come from the immunized Mendoza. It remained a question of fact whether every subject Capra and Fitzgerald now thought they might have heard about from Mendoza had been heard by them on October 3 or 4 or had come to them from sources other than Mendoza in the course of their investigation or had in fact been told them by Mendoza after October 5.

Mendoza sought to refresh his recollection regarding the claimed conversations with Curbello by using what Mendoza's counsel described as a "redacted typewritten version" of notes Mendoza wrote and then hid in the heel or sole of his boots while in jail. The government objected to the admission of these notes because the chain of custody had not been proved. The court first excluded them but then ruled: "As tortured as the chain of custody appears to be, I am going to go ahead and change my ruling, accept that there was a chain of custody that has been shown. And as I stated further, however, earlier, the weight of what is contained in the boot notes is of such insignificance that it matters not in any regard."

After hearing all of the witnesses the court asked what standard should be used in a *Kastigar* hearing to shift the burden of proof to the government. Neither party was able to point to case law on the point. The court observed: "But since it's such an important concept, you would think then that it would rise above preponderance and would at least be on the midlevel of clear and convincing, would it not?" Defense counsel said that he

would continue to research the issue. After this colloquy, the court admitted the boot notes and added: "And I further find that there has been no shifting of the burden to the government and I am going to deny the motion in its entirety at this time."

Thereafter the court sentenced Mendoza, accepting the government's recommendation for a two-level upward adjustment due to Mendoza's use of a special skill in his operation of a tractor-trailer. The court also made an upward departure two levels based upon the "sophistication, the enormous amount of drugs involved in this operation over a long period of time." Mendoza was sentenced to imprisonment for 22 years, four months.

He now appeals the denial of the *Kastigar* motion and the enhancements of his sentence.

## ANALYSIS

*The* Kastigar *Motion.*

When a person is granted immunity under 18 U.S.C. § 6002 and is then prosecuted, he "need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Kastigar v. United States*, 406 U.S. 441, 461–462, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972). We have applied the *Kastigar* standard to informal immunity agreements, but we have added that when "the defendant has not been forced to testify and so has not claimed the Fifth Amendment privilege against self-incrimination, the government can grant the defendant varying degrees of immunity in an informal agreement." *United States v. Dudden*, 65 F.3d 1461, 1467 (9th Cir.1995), citing *United States v. Plummer*, 941 F.2d 799, 802 (9th Cir.1991). The government in this case does not dispute that it is bound by the informal agreement made by state prosecutors with Mendoza not to use any information against him after October 5, 1989. We interpret such an agreement "using ordinary contract principles." *Dudden*, 65 F.3d at 1467.

To trigger the shifting of the burden of proof to the government so that it has an

obligation to show that it did not use any information against the defendant obtained after the grant of immunity the defendant has to meet the initial burden of showing that in fact he did offer such information under the grant of immunity. As in any contract case, he must show that the contract was breached by a preponderance of the evidence. Whether Mendoza did or did not make such a showing was the factual question that the district court had before it. The district court held that Mendoza had failed to shift the burden of proof.

The ruling of the district court was a determination of credibility. If Mendoza had been believed, the government witnesses were lying and he had provided a fair amount of information after October 5. If the government witnesses were truthful, Mendoza was spinning statements designed to get himself out of trouble. The district court found in favor of the government. We are not in a position to take a second look, which could only be a guess from a distance, inspecting paper instead of faces.

Mendoza tries to make something out of the district court's speculation that a defendant must show "clear and convincing" evidence that he had furnished immunized information. The record does not show that the district court applied this standard. The record shows only an ordinary evidentiary ruling by the district court finding a failure of proof by Mendoza.

*Sentencing*

Mendoza argues that driving a tractor-trailer was no special skill and that he had modest qualifications as a truck driver. To the contrary, the driving of an 18-wheeler without any reported mishap over several years is a skill well beyond that possessed by the general public. We agree with the Seventh Circuit that such abilities constitute a special skill under the guidelines, U.S.S.G. § 3B1.3 (1987), *United States v. Lewis*, 41 F.3d 1209, 1214 (7th Cir.1994), and affirm the special skills enhancement of Mendoza's sentence.

We do, however, find partial error in the district court's conclusion that Mendoza's sentence should be enhanced because of the "sophistication, the enormous amount of drugs involved in this operation over a long period of time." The court properly took into account both the duration and the sophistication of the conspiracy in which Mendoza was deeply involved. *Ponce*, 51 F.3d at 829. However, upward departure cannot be based on the quantity of drugs. *United States v. Martinez*, 946 F.2d 100 (9th Cir. 1991). It is not clear to what degree quantity played a part in the upward departure.

We **AFFIRM** the judgment of conviction. We **REMAND** for reconsideration of the single sentencing departure because its basis is ambiguous.

**AFFIRMED AND REMANDED.**