**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 26, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

NORMAN WASHINGTON BERRY,

        Defendant - Appellant.

No. 11-2186

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:07-CR-01170-BB-1)**

Margaret Ann Katze, Assistant Public Defender, District of New Mexico, (Brian Anthony Pori, Assistant Federal Public Defender, on the brief) Albuquerque, New Mexico, for Defendant – Appellant.

Gregory J. Fouratt, United States Attorney Office (Kenneth J. Gonzales, United States Attorney; Laura Fashing, Assistant United States Attorney, on the brief) Albuquerque, New Mexico, for Plaintiff – Appellee.

Before **HOLMES**, **O'BRIEN**, and **MATHESON**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

      What started as a routine inspection of Norman Washington Berry's commercial tractor-trailer at a New Mexico port of entry eventually revealed boxes of marijuana

nestled in with his load of cantaloupe. A jury convicted Berry of possession with intent to distribute 100 kilograms or more of marijuana. He complains about a "permissive inference" instruction given to the jury and claims the evidence was insufficient to establish the weight of the marijuana to be more than 100 kilograms. He also claims his sentence ought not have been enhanced based on his use of a special skill—commercial truck driving—to facilitate the commission of the crime. We affirm.

**BACKGROUND**

We recite the facts in the light most favorable to the jury's verdict. *See United States v. Pablo*, 696 F.3d 1280, 1284 n.5 (10th Cir. 2012). At approximately 6:40 a.m. on May 23, 2007, Berry, a commercial truck driver, stopped at the Gallup, New Mexico port of entry in his tractor-trailer.[1] He was greeted by Hermilo Lucero, an officer with the New Mexico Department of Public Safety, Motor Transportation Police Department. Lucero asked Berry "where he was coming from, where he was going, and what he was carrying." (Vol. 3, Pt. 1 at 8.) He told Lucero he was carrying cantaloupe from Phoenix, Arizona, to Massachusetts. Lucero reviewed Berry's logbook. It confirmed he had been in Phoenix but contained no information about the cantaloupe or the total miles logged. Based on these logging violations, Lucero decided to perform a Level 2 safety inspection,

---

[1] With limited exceptions, New Mexico law requires all commercial vehicles entering or leaving the state to stop at all ports of entry. N.M. Stat. Ann. § 65–5–1(A), (H). It also allows agents at the ports of entry to inspect commercial vehicles and the driver's documentation for compliance with state and federal law. *Id.* §§ 65–1–9, 65–5–1(B)-(G).

which consists of reviewing the driver's paperwork, including the bill of lading, and inspecting the cargo.

The bill of lading did not indicate where the cargo had been loaded but did show the shipper was a company in Turlock, California. When Lucero asked Berry why he had come from Phoenix, Arizona, when the cargo came from California, Berry became nervous and started stuttering. He explained another driver had picked up the load in Turlock and met him in Phoenix, where they traded trailers. But the signature on the bill of lading of the individual who picked up the cargo appeared to be Berry's. The bill of lading also listed the cargo's destination as Bronx, New York, not Massachusetts. Berry could not explain this discrepancy. According to Lucero, during this exchange, Berry was "real nervous," "couldn't sit still," and "kept standing, sitting down." (R. Vol. 3, Part 1 at 17.)

When Lucero went to inspect the cab of the tractor, Berry volunteered that he was moving from California to Georgia. After looking in the cab Lucero moved to the trailer, accompanied by Berry. There was no seal on the cargo doors. When Berry opened them, Lucero immediately noticed the load of cantaloupe had shifted. He also noticed eight brown boxes stamped "UPS" sitting at the rear of the trailer; they did not match the boxes containing the cantaloupe. (R. Vol. 3, Part 1 at 19.) When Lucero asked what the eight boxes were, Berry "became nervous," "[h]is voice started to crack," and said they "were his personal household stuff, kitchen items, stuff from his house," which he was moving from California to Georgia. (*Id.* at 22.) Because there was no bill of lading for the boxes,

- 3 -

Lucero opened them. They contained thirty-three bundles of marijuana wrapped in brown contact paper, plastic wrap, and tin foil. Berry was arrested.

A more thorough inspection of the cab revealed documentation showing Berry and his tractor-trailer had been in California on May 21 and 22 and in Kingman, Arizona, on May 22. His logbook, however, showed he had driven from Van Horn, Texas, to Phoenix, Arizona, on May 21 and had stayed in Phoenix until 3 a.m. on May 23.

Berry was indicted for possession with intent to distribute 100 kilograms or more of marijuana. He was released on bond and permitted to return to his home in Georgia. The trial was scheduled to start on May 7, 2008, but Berry failed to appear. He remained a fugitive until April 29, 2010, when he was located in Canada after returning from Jamaica (his home country).

The presentence report (PSR) assigned a base offense level of 26 because the weight of the marijuana was between 100 and 400 kilograms. *See* USSG §2D1.1(c)(7).[2] Two points were added for obstruction of justice due to Berry's pre-trial flight. He had no criminal history, resulting in a Criminal History Category of I. With that criminal history and a total offense level of 28, the advisory guideline range is 78-97 months imprisonment. The government objected to the PSR. It argued the offense level should be increased by two under USSG §3B1.3 because Berry used a special skill—commercial

---

[2] Berry was sentenced under the 2010 edition of the United Sentencing Guidelines Manual. All references to the guidelines in this opinion refer to the 2010 edition unless otherwise indicated.

- 4 -

truck driving—to facilitate the commission or concealment of the offense. The probation officer disagreed and concluded Berry did not use his commercial driver's license in a manner significantly facilitating the commission or concealment of the offense.

The judge decided the "special skill" adjustment applied, making the total offense level 30 and raising the advisory guideline range to 97-121 months. He sentenced Berry to 97 months imprisonment.

## DISCUSSION

a.  "Permissive Inference" Jury Instruction

"We review a district court's decision to give a particular jury instruction for an abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *United States v. Gwathney*, 465 F.3d 1133, 1142 (10th Cir. 2006).

The key issue at trial was whether Berry knew about the marijuana in his trailer. The judge told the jury a guilty verdict required it to find the government had proved beyond a reasonable doubt that, *inter alia*, Berry knowingly or intentionally possessed a controlled substance. The instructions also advised the jury about the meaning of the word "knowingly," to wit: "the act was done voluntarily and intentionally, and not because of mistake or accident." (R. Vol. 1 at 99.) The instructions also addressed permitted inferences.

The first sentence of the "permissive inference" instruction seemingly allowed the jury to infer criminal knowledge based solely on Berry's exclusive possession of the vehicle containing the drugs:

> In determining whether or not the defendant knowingly possessed the controlled substance, if you find the government has proved beyond a reasonable doubt that the defendant had sole possession of a vehicle in which the controlled substance was found, you may infer—but are not required to infer—that the defendant knowingly possessed the controlled substance.

(*Id.* at 101.)  However, the remaining sentences qualified the basis of the inference and reminded the jury of the government's burden:

> Any inference you draw must be based upon all the evidence in the case, not merely the defendant's relationship to the vehicle.  Although this inference is permitted—if you believe it is justified in light of all the evidence—I caution you that the burden of proof does not shift.  The burden remains with the government to prove beyond a reasonable doubt that the defendant knowingly possessed the controlled substance.

(*Id.* at 101.)  Berry objected to the instruction before it was given and continues to do so.

The challenged instruction is permissive because it allows—but does not require—the jury to infer an elemental fact (knowledge) from Berry's sole possession of the vehicle in which the drugs were found.  *Cnty. Court of Ulster Cnty., N.Y. v. Allen*, 442 U.S. 140, 157 (1979) (habeas case); *see also Gwathney*, 465 F.3d at 1143 ("The jury instruction . . . is a permissive instruction because it tells the jury it may, but is not required to, draw an inference about Gwathney's knowledge of the marijuana stored in his truck based on his operation of the vehicle."); *United States v. Cota-Meza*, 367 F.3d 1218, 1221 (10th Cir. 2004) ("The instruction in question is permissive because it tells

the jury that it *may*, but is not required to, draw the inference of Cota-Meza's knowledge of the cocaine, and that it is not required to convict the defendant based on this inference alone."). "A permissive inference instruction is valid if there is a rational connection between the fact that the prosecution proved and the ultimate fact presumed, and the latter is more likely than not to flow from the former." *Cota-Meza*, 367 F.3d at 1221-22 (citing *Ulster Cnty.*, 442 U.S. at 165). "We judge that likelihood not in the abstract but as applied to the specific case in which the instruction was given." *Id*. at 1222.

In *Gwathney*, the defendant, like Berry, was a commercial truck driver, who was found at a New Mexico port of entry with a large amount of marijuana in his trailer. 465 F.3d at 1136-37. With respect to Gwathney's knowledge of the contraband in his truck, the jury was told it could—but was not required to—infer that the driver and sole occupant of a vehicle containing drugs has knowledge of the drugs within it. *Id.* at 1138. It was also told "[t]his inference [did] not relieve the government of its obligation to prove all of the elements of the offense beyond a reasonable doubt." *Id.* (citation omitted). We concluded the trial judge did not abuse his discretion in giving the instruction. *Id.* at 1143. Pertinent to, if not determinative of, our decision were facts making the inference of Gwathney's knowledge of the drugs more likely than not to flow from his sole custody and control of the trailer containing them: although he did not load the trailer, it was not sealed (giving him unrestricted access to the trailer's contents) and he signed the bill of lading; shoe prints and crushed boxes leading to the marijuana suggested someone, either Gwathney or someone acting at his behest, placed the drugs in

- 7 -

the trailer after it was loaded with legitimate cargo and while it was in Gwathney's control; and the high value of the marijuana suggested it would not be transported without the driver's knowledge. *Id.* at 1143.

Similarly, in *Cota-Meza*, police stopped a van driven by the defendant. 367 F.3d at 1220. Cocaine was discovered in a hidden compartment of the van. *Id.* According to the instructions, the jury was permitted, but not required, to infer Cota-Meza's constructive possession of the drugs if it found, beyond a reasonable doubt, his sole possession of the van. *Id.* at 1221. It was cautioned, however, that the inference did not relieve the government of its obligation to prove all of the elements of the offense beyond a reasonable doubt. *Id.* Cota-Meza argued the instruction violated his due process rights because it emphasized his sole possession of the vehicle to the exclusion of all other evidence and impermissibly discouraged the jury from considering all of the evidence. *Id.* We concluded it was not an abuse of discretion for the judge to give the instruction because, under the facts of the case, the inference of Cota-Meza's constructive possession[3] of the drugs hidden in the van was more likely than not to flow from his sole

------

[3] "[C]onstructive possession exists where the defendant has the power to exercise control or dominion over the item." *United States v. Lopez*, 372 F.3d 1207, 1212 (10th Cir. 2004). In drug cases, "constructive possession is an appreciable ability to guide the destiny of the contraband." *United States v. Al-Rekabi*, 454 F.3d 1113, 1118 (10th Cir. 2006) (quotation marks and citation omitted). Except in cases of joint occupancy, "[d]ominion, control, and knowledge . . . may be inferred if a defendant had exclusive possession of the premises" where the object is found. *United States v. Bowen*, 437 F.3d 1009, 1014 (10th Cir. 2006) (quotation marks and citation omitted). Similarly, when a

(continued. . .)

possession of the van. *Id.* at 1221-22. The high value of the drugs and the easy accessibility of the hidden compartment indicated the owner of the drugs would not have allowed the van to be used by someone who had no knowledge of the drugs. *Id.* at 1222. Moreover, Cota-Meza was paid to drive the van. *Id.* We decided the instruction did not impermissibly shift the burden of proof to Cota-Meza because it required the government to prove beyond a reasonable doubt all of the offense elements, including Cota-Meza's sole possession of the van, which was the critical fact permitting the inference. *Id.* at 1223. However, we suggested a better instruction would have permitted the jury to draw the inference "only if in light of all of the other evidence, the defendant's sole possession of the vehicle convinced the jury beyond a reasonable doubt that he knew of the drugs." *Id.* at 1222-23. Nevertheless, we affirmed because the other instructions adequately informed the jury of the government's burden of proof, the defendant's presumption of innocence and the jury's obligation to consider all of the evidence. *Id.* at 1223.

A *leitmotif* is easily discerned. In both cases evidence apart from the defendant's sole possession of the truck and trailer was a significant consideration. A relevant conclusion necessarily follows—a permissive inference instruction may not be given

---

defendant has sole possession of the vehicle in which drugs are discovered, his knowledge of the drugs may be inferred from that possession and other case facts. *Gwathney*, 465 F.3d at 1143; *Cota-Meza*, 367 F.3d at 1221-22.

unless the trial judge is first convinced it is justified by the whole of the evidence[4] and the jury must be clearly instructed on its permissible use.

The permissive inference instruction given in this case passes muster. As in *Gwathney* and *Cota-Meza*, the totality of the evidence supports the inference of Berry's knowledge (actually, it provides almost overwhelming support for the inference). He owned the truck and trailer in which the drugs were discovered. He claimed ownership of the boxes of marijuana by telling Lucero they contained personal items he was moving from California to Georgia.[5] The trailer doors were not sealed, making for easy access to the cargo. The boxes of marijuana were easily accessible and in plain view and were distinguishable from those containing cantaloupe. There was no bill of lading for the marijuana boxes (not even one containing false information about their contents). The information Berry supplied to Lucero concerning his travels was inconsistent with the bill of lading. His story about getting the trailer from another driver is a transparent lie. Documentation recovered from the truck's cab showed Berry had been in California, a drug source area. The marijuana had a value of about $114,000, making it unlikely the owner would entrust it to someone without knowledge of its presence. Finally, Berry

---

[4] A jury instruction is only proper if supported by the evidence. *Thompson v. United States*, 223 F.3d 1206, 1210 (10th Cir. 2000). Had Berry hooked his tractor to an already loaded and sealed trailer, the instruction would likely have been refused. Had the seal been unbroken at the port of entry and traceable to the shipper, the instruction could not reasonably have been given.

[5] He may have said so to avoid the bill of lading problem, but the reason matters not. Whatever his motivation for doing so, he claimed ownership of the boxes.

- 10 -

absconded before trial, indicating consciousness of guilt. *See United States v. Martinez,* 681 F.2d 1248, 1256 (10th Cir. 1982).

Permissive inferences have received a fair share of criticism. The chief criticism is "that they isolate and abstract a single circumstance from the complex of circumstances presented in any given case, and, on proof of that isolated fact, authorize an inference of some other fact beyond reasonable doubt." Charles R. Nesson, *Reasonable Doubt and Permissive Inferences: The Value of Complexity*, 92 Harv. L. Rev. 1187, 1192 (1979); *see also United States v. Rubio-Villareal*, 967 F.2d 294, 299 (9th Cir. 1992) (permissive inference instruction allowing jury to infer defendant's knowledge of drugs if jury found defendant was the driver of the vehicle containing the drugs and the drugs were concealed within the vehicle improper because, *inter alia*, "it focused the jury on some rather than all the facts"). In *Morissette v. United States*, the Supreme Court said: "A presumption which would permit but not require the jury to assume intent from an isolated fact would prejudge a conclusion which the jury should reach of its own volition. A presumption which would permit the jury to make an assumption which all the evidence considered together does not logically establish would give to a proven fact an artificial and fictional effect." 342 U.S. 246, 275 (1952). In an opinion upholding the giving of a permissive inference instruction because other instructions made clear the judge was not implying the jury should return a guilty verdict, the Ninth Circuit observed:

- 11 -

> Our fact-intensive review makes us question the effectiveness of permissive inference instructions. They are most effective when least appropriate: where the evidence supporting the inference is sparse and the inference is most crucial to the government's case. Where extensive background facts support the inference and reduce the likelihood that the verdict will be tainted, the instruction is far less likely to play a significant role in the jury's deliberations. Perhaps we are emphasizing the opposite ends of a spectrum; there may be a middle ground where a permissive inference instruction assists the jury without being overly intrusive or misleading. Still, closing argument affords the government and defense counsel ample opportunity to argue which inferences may be drawn from the evidence. By inviting the district court to join in this process, the government risks introducing error, without gaining much tangible benefit.

*United States v. Warren*, 25 F.3d 890, 899-900 (9th Cir. 1994).

The expressed concerns are reason for cautious and careful use of the instruction. The evidence here clearly justified the charge, but the instruction could stand improvement. The first sentence tells the jury it may infer Berry's knowledge of the marijuana if it finds beyond a reasonable doubt he had sole possession of the vehicle, an undisputed fact. Elements require proof beyond a reasonable doubt. Individual facts do not. An instruction requiring proof of a fact—sole possession of the vehicle—beyond a reasonable doubt has the potential of confusing proof of that fact with the proof of an element−knowledge−beyond a reasonable doubt. Moreover, the instruction makes a broad statement (the inference is permitted) and then qualifies it (if consistent with all of the other evidence). That approach increases the risk of confusion. We reiterate what we said in *Cota-Meza*—a better instruction would have told the jury to draw the inference "only if in light of all of the other evidence, the defendant's sole possession of the vehicle

- 12 -

convinced the jury beyond a reasonable doubt that he knew of the drugs."[6]  367 F.3d at 1222-23.

That said, the instruction here did require the inference to be based on all of the evidence, not just Berry's relationship to the tractor-trailer.  And, critically, it cautioned that the burden of proof did not shift—the government was required to prove knowledge beyond a reasonable doubt.  *See Ulster Cnty.*, 442 U.S. at 156 (stating a permissive inference is constitutional if it does not undermine the jury's duty to find guilt beyond a reasonable doubt).  Other jury instructions also reminded the jury of the government's burden and the jury's duty to consider all of the evidence.  We consider the jury instructions as a whole.  *Gwathney*, 465 F.3d at 1142.  A jury is presumed to follow its instructions.  *See United States v. Almaraz*, 306 F.3d 1031, 1037 (10th Cir. 2002) ("We presume jurors attend closely to the language of the instructions in a criminal case and follow the instructions given them.").  The judge did not abuse his discretion in giving the permissive inference instruction.

---

[6]  A permissive inference instruction might read as follows:

> The government must prove beyond a reasonable doubt that the defendant was aware of the presence of the controlled substance in the vehicle.  You may infer—but are not required to infer—his knowledge based upon his sole possession of the vehicle.  Although you are permitted to draw that inference, it cannot be drawn without consideration of all of the facts.  Ultimately you must be convinced based upon all of the evidence and beyond a reasonable doubt, that he knew the controlled substance was present in the vehicle.

Had there been error, it would have been harmless. *See United States v. Barbee*, 968 F.2d 1026, 1033 (10th Cir. 1992) (erroneous giving of jury instruction subject to harmless error analysis). As set forth above, the evidence of Berry's knowledge of the marijuana was overwhelming. Especially damning was his claimed ownership of the boxes containing the marijuana.

b.      <u>Weight of Marijuana</u>

Officer Lucero testified the marijuana was packaged in brown contact paper, tin foil and plastic wrap. His testimony along with that of DEA agents Erin Croft and David Smith spoke to a common circumstance: bulk marijuana is often packaged in large bundles wrapped in plastic, tin foil, or contact paper and covered with some type of "masking agent," such as liquid laundry detergent, tar, oil, axle grease, dryer sheets, mustard, coffee or peanut butter, to mask the smell. (Vol. 3, Pt. 2 at 214.) Croft and Smith also testified about DEA policy. When a large amount of marijuana (over 10 kilograms) is intercepted, the policy is to preserve a one kilogram sample and ten smaller random samples. The remainder is destroyed unless there is an objection to its destruction by either the government or defendant.

Croft's testimony also established the gross weight of the marijuana—the drug plus its packaging and any masking agent—totaled 175.25 kilograms. Croft did not know the weight of the marijuana without packaging or masking agents. According to Smith, when bulk amounts of marijuana are involved, the DEA does not remove any packaging material before weighing the marijuana because it is "too tedious" and

- 14 -

"mess[y]" and it compromises the safety of the agents who might inhale the marijuana. (R. V.3, Pt. 2 at 211.) However, in cases involving large amounts of marijuana, the government and defense counsel often agree to attribute ten percent of the gross weight to packaging. When asked what masking agent was used in this case, Smith opined, based on his in-court examination of the one kilogram sample of marijuana presented to the jury, there was no masking agent, just contact paper and plastic wrap.

After the government presented its case, Berry moved for a directed verdict, arguing the government had failed to prove the actual weight of the seized marijuana was at least 100 kilograms. The motion was denied. Berry renews his argument here. While the evidence showed the gross weight of the marijuana was 175.25 kilograms, he contends its weight included the packaging materials and masking agent. He emphasizes, correctly, that no evidence as to the weight of the packaging materials or the masking agent was produced and the government failed to perform any analysis to determine the masking agent used. And he claims, also correctly, that Agent Smith's testimony about the government and defense attorneys sometimes agreeing to attribute ten percent of the gross weight of the marijuana to the packaging and masking agent is insufficient to determine net weight. According to Berry, there is no DEA policy or other written policy to that effect and there was no testimony that such reduction would be appropriate in this case.

We review sufficiency-of-the-evidence challenges de novo. *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1123 (10th Cir.), *cert. denied*, 132 S. Ct. 540 (2011).

We ask whether, "viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Cornelius*, 696 F.3d 1307, 1316 (10th Cir. 2012) (quotation marks and citation omitted). "We consider both direct and circumstantial evidence, together with the reasonable inferences to be drawn therefrom." *Id.* (quotation marks and citation omitted). "We may not disturb the jury's credibility determinations, nor weigh the evidence in performing this analysis." *Acosta-Gallardo*, 656 F.3d at 1123. "We will reverse a conviction only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Cornelius*, 696 F.3d at 1316 (quotation marks and citation omitted).

The jury was instructed that to convict Berry, it had to find the government proved beyond a reasonable doubt "the weight of the marijuana defendant possessed was at least 100 kilograms as charged." (R. Vol. 1 at 98.) The gross weight of the marijuana was 175.25 kilograms. But, based on a picture of a cross-section of one of the marijuana bundles, the description of the packaging and other evidence bearing on the issue, a jury could find, beyond a reasonable doubt, the weight of the packaging did not exceed 43% of the gross weight, meaning the marijuana weighed at least 100 kilograms. While Berry claims a masking agent such as oil or peanut butter could add considerable weight to the marijuana, Smith's in-court examination of the one kilogram sample of marijuana (which

was also passed around to the jury) did not indicate use of a masking agent.[7] The jury was free to accept his observation (and its own). The evidence as to the weight was sufficient.

c.      Special Skill Adjustment

The district judge applied a two-level upward adjustment to Berry's base offense level for use of a special skill under USSG §3B1.3. The guideline calls for such an adjustment if the defendant used a "special skill" in a manner that "significantly facilitated the commission or concealment of the offense." USSG §3B1.3. In order to impose the adjustment, "the court must find two things:  (1) [d]efendant possessed a special skill . . . and (2) [d]efendant used that skill . . .  to significantly facilitate the commission or concealment of the offense." *United States v. Burt*, 134 F.3d 997, 998-99 (10th Cir. 1998). "Special skill" means "a skill not possessed by the members of the general public and usually requiring substantial education, training or licensing. Examples include pilots, lawyers, doctors, accountants, chemists, and demolition experts." USSG §3B1.3, comment. (n.4). The purpose of the special skill adjustment "is

---

[7] In a footnote in his opening brief, Berry claims the evidence was also unclear as to whether the marijuana included stems and stalks which should have been excluded from the net weight. *See* 21 U.S.C. § 802(16) (defining marijuana for purposes of the Controlled Substances Act as not including "the mature stalks" of the plant). We decline to address the issue because it is raised only in a footnote and was not raised in the district court. *See United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived."); *see also United States v. Mora*, 293 F.3d 1213, 1216 (10th Cir. 2002) (stating we generally do not address arguments raised for the first time on appeal).

to punish those individuals who use their special talents to commit crime." *United States v. Rice*, 52 F.3d 843, 851 (10th Cir. 1995). Thus, to apply the adjustment, "the skill must be more than the mere ability to commit the offense." *Burt*, 134 F.3d at 999 (quotation marks and citation omitted).

Berry's commercial truck driving significantly facilitated the commission of the offense. The only question is whether commercial truck driving is a special skill. Berry says it is not. He argues the application note to USSG §3B1.3 makes the special skill adjustment appropriate only when the defendant utilizes skills necessitating substantial education, training or licensing analogous to those required of the occupations listed as examples. As the probation officer noted in disagreeing with the government regarding the application of the adjustment, a commercial driver's license (CDL) is granted to anyone who passes a written and driving test and pays the required fees. Berry claims this training cannot be equated with the training necessary to become a pilot, lawyer, doctor, accountant, chemist or demolition expert.

We review the district court's application of the sentencing guidelines de novo. *United States v. Haber*, 251 F.3d 881, 890 (10th Cir. 2001). "We review the district court's factual findings that [d]efendant possessed a special skill and that he used that special skill to facilitate the commission of his offense, for clear error." *United States v. Gandy*, 36 F.3d 912, 914 (10th Cir. 1994).

We have yet to address the issue, but the Seventh and Ninth Circuits have concluded the skill necessary to operate a commercial tractor-trailer is a "special skill"

under USSG §3B1.3.  *See United States v. Lewis*, 41 F.3d 1209, 1214-15 (7th Cir. 1994); *United States v. Mendoza*, 78 F.3d 460, 465 (9th Cir. 1996).  The *Lewis* court reasoned:

> Although no case has yet discussed the application of the section to truck driving, it requires no leap of logic to conclude that the skills necessary to operate an eighteen-wheeler justify enhancement under the section.  An over-the-road commercially-employed truck driver is required to have a special operator's license.  Members of the general public would have more than a little trouble successfully maneuvering a loaded eighteen-wheeler along roads and through parking lots.  Defense counsel suggested at oral argument that anyone who can drive a car can pilot a big truck down the highway.  Although ordinary driving skills may be sufficient to keep a big rig running on limited-access expressways, we seriously doubt whether the average citizen possesses the ability to guide a truck through tight spaces on city streets. Truck driving requires technical knowledge or ability that the average citizen does not possess.

41 F.3d at 1214; *see also Mendoza*, 78 F.3d at 465 ("[T]he driving of an 18-wheeler without any reported mishap over several years is a skill well beyond that possessed by the general public.").

We agree with these courts, at least as applied to these facts.  While an individual may be able to obtain a CDL merely by taking a written and driving test and paying the necessary fee, Berry received his CDL after a year of truck-driving school and on-the-job training.  This training is small potatoes when compared to the training necessary to become a pilot, lawyer, doctor, accountant, chemist or demolition expert—the professions listed in the application note to the guideline.  But the listed professions are mere examples of "special skills"; they are by no means an exhaustive list.  Moreover, a defendant need not complete formalized educational or licensing requirements to possess a special skill; it can also come from experience or self-teaching.  *Gandy*, 36 F.3d at 914.

Here, Berry not only had a year of training, he also had almost five years of truck-driving experience at the time of the offense. Furthermore, Berry offered the testimony of an expert on truck driving at trial. The expert testified as to the specialized knowledge a commercial truck driver must have concerning such things as legal weight limits, various state permitting and taxing obligations, and logbook requirements. Under these circumstances, the "special skill" finding was proper.

Berry also argues the adjustment was erroneously applied because his truck driving skill was already accounted for in his base offense level as the base offense level was based on the large quantity of marijuana, which only could be transported via a commercial vehicle. USSG §3B1.3 says the adjustment "may not be employed if [a special] skill is included in the base offense level or specific offense characteristic." Berry's base offense level was based on the large quantity of marijuana involved, which perhaps could only have been transported via a commercial vehicle. However, Berry's special skill as a truck driver was not factored into the determination of his base offense level.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

11-2186, United States v. Berry

**HOLMES**, J., concurring.

I join the Panel's opinion in full. I write separately to offer additional thoughts regarding the special-skill enhancement, U.S.S.G. § 3B1.3, and Mr. Berry's contention that his truck-driving skills do not qualify as a special skill. These additional comments are fully in accord with the Panel's opinion, as I read it, and are meant to further clarify the application of this Guideline.

Beginning with the Guideline's language, it states that "[i]f the defendant . . . used a special skill[] in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." U.S.S.G. § 3B1.3. The commentary defines "special skill" as "a skill not possessed by members of the general public *and* usually requiring substantial education, training or licensing," and provides that "[e]xamples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." *Id.* § 3B1.3 cmt. n.4 (emphasis added).

It seems patent that the commentary's drafters intend for us to treat these few examples as categorically qualifying for the enhancement. In other words, any defendant who has acquired the high level of education, training, or licensing that is required to occupy one of these specified positions should be deemed to possess a special skill within the meaning of § 3B1.3. However, once one departs from this rarefied, categorical domain, the focus of the special-skill inquiry must center on the actual capabilities possessed by a given defendant, rather than the labels or titles that may be associated with his or her purported special skill.

This is true because a given profession or job title can encompass a broad range of abilities, some of which may qualify as a special skill and others of which may not. For example, a certain level of computer skills would qualify as a special skill, while the rudimentary ability to use a computer would most likely not. *See United States v. Petersen*, 98 F.3d 502, 507 n.5 (9th Cir. 1996) ("We do not intend to suggest that the ability to use or access computers would support a 'special skill' adjustment under all circumstances. Computer skills cover a wide spectrum of ability."). *Compare id.* at 506–07 (concluding that the defendant's "high level" computer skills qualified as a special skill), *with United States v. Lee*, 296 F.3d 792, 799 (9th Cir. 2002) (holding that the defendant's computer skills were not a special skill because, *inter alia*, they did not rise to the level of sophistication of the defendant's special skills in *Petersen*, *supra*), *and United States v. Godman*, 223 F.3d 320, 322–23 (6th Cir. 2000) (same). The Panel's opinion recognizes this point (albeit tacitly) because it focuses on Mr. Berry's particular truck-driving abilities, rather than on whether or not truck-driving skills categorically constitute a special skill.

As for how this inquiry should be conducted on a case-by-case basis, the commentary makes clear that, to qualify as a special skill, the skill must not only be one that is "not possessed by members of the general public," but it must also "usually requir[e] substantial education, training or licensing." U.S.S.G. § 3B1.3 cmt. n.4. This creates a two-part test, both parts of which must be met for a given

skill to qualify as a special skill. *See Lee*, 296 F.3d at 798 ("[T]his sentencing guideline is best read[] as a two-part test. The test is not just whether the skill is 'not possessed by members of the general public,' but also, as a *sine qua non*, whether it is a skill 'usually requiring substantial education, training, or licensing.'" (citation omitted)); *see also Godman*, 223 F.3d at 322 (noting that the district court stressed "overmuch" on whether the defendant's skills were not shared by the general public and that because the commentary refers "to the substantial training of such professionals as doctors and accountants . . . , emphasis is better placed on the difficulty with which a particular skill is acquired"); *United States v. Young*, 932 F.2d 1510, 1512–13 (D.C. Cir. 1991) (rejecting the proposition that the special skill enhancement "is due whenever an offense involves some skill that the general public does not possess"). *But cf. United States v. De La Cruz Suarez*, 601 F.3d 1202, 1219 (11th Cir. 2010) ("If an 'average person off the street' does not possess the skill, then the skill is considered 'special' for the purposes of applying the [special skill] enhancement." (quoting *United States v. Calderon*, 127 F.3d 1314, 1339 (11th Cir. 1997))). A court first undertakes the relatively straightforward inquiry into whether the skill is possessed by members of the general public; if it is not, the court must proceed to ensure that the second part of the test is met.

The second part of the test requires the skill to be one that "usually requir[es] substantial education, training or licensing." U.S.S.G. § 3B1.3 cmt.

3

n.4.  Regarding this inquiry, two points are worth underscoring.  First, adopting a reading that is consistent with the evident purpose of the enhancement—to define a relatively narrow subset of the possible universe of skills possessed by defendants that would warrant greater sanction when employed to facilitate the commission or concealment of crimes—the term "substantial" should be read as modifying all three terms that come after it.[1]  If this were not so, the second part of the two-part test would be rendered essentially surplusage.  *See FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1198 (10th Cir. 2009) ("Under a long-standing canon of statutory interpretation, one should avoid construing a statute so as to render statutory language superfluous." (quoting *McCloy v. U.S. Dep't of Agric.*, 351 F.3d 447, 451 (10th Cir. 2003)) (internal quotation marks omitted)); 3 Norman J. Singer, et al., *Sutherland Statutory Construction* § 59:8 (7th ed. 2012) ("Interpretations that render a statutory provision superfluous, or insignificant, are avoided wherever possible.").

Notably, this is true because almost every skill not possessed by the general

---

[1]     Relatedly, a panel of our court has implicitly held that the mere possession of *any* licence does not necessarily mean that one has a special skill. *See United States v. Hinshaw*, 166 F.3d 1222, 1999 WL 9762, at *4 (10th Cir. Jan. 2, 1999) (holding that the defendant's possession of a firearms license was insufficient to qualify him for the special skill enhancement because "[t]he special skills involved in licensing pilots, lawyers, doctors, and accountants are not comparable to the somewhat perfunctory qualifications the law requires to obtain a firearms license").  Although *Hinshaw* is not binding authority, I find its reasoning persuasive on this point.

public requires some minimal level of training, and since the terms in the clause are stated disjunctively, if the adjective "substantial" does not extend to the noun "training," in virtually every instance defendants would qualify for the enhancement if they had a skill not possessed by members of the general public—*viz.*, it would follow virtually ineluctably from defendants' possession of a skill not possessed by the general public that they would also possess at least some minimal level of training, thus satisfying the second part of the two-part test. The effect would be to render this second part essentially surplusage and make the not-possessed-by-the-general-public inquiry—the first part of the test—the sole inquiry in almost all cases. This runs contrary to the clear terms of the commentary that establish a two-part test for determining whether a defendant possesses a special skill.

It should be acknowledged that the placement of the comma after the term "education," might suggest the establishment of a separate and distinct conceptual unit in which "substantial" modifies only "education." *See, e.g.*, *The Chicago Manual of Style* § 6.16, at 311 (16th ed. 2010) (noting that the placement of a comma "usually denotes a slight pause"). However, contrary to the "widely practiced usage," the commas in the clause at issue are not used serially, *id.* § 6.18, at 312; *see A Manual of Style* § 8.43, at 122 (1986) (noting that commas appear "[a]fter each member within a series of three or more words . . . used with *and*, *or*, or *nor*"); Bryan A. Garner, *A Dictionary of Modern Legal Usage* 714 (2d

5

ed. 1995) (noting that a comma is used "[t]o separate items (including the last from the penultimate) in a list of more than two"), from which we might more readily infer the intent to create three separate and discrete conceptual categories. And reading the clause to define such a category for "substantial education" is certainly not the only grammatical way to read the language. *See, e.g.*, *Palmer v. Martinez*, 42 So.3d 1147, 1153 (La. Ct. App. 2010) ("reject[ing] [a] strained interpretation regarding the use of the comma as unreasonable and absurd" that would have read the word "written" in the phrase "written contract, agreement, or permit" as only extending to the word "contract" (internal quotation marks omitted)); *cf. Flores-Figueroa*, 556 U.S. 646, 652 (2009) ("The manner in which the courts ordinarily interpret criminal statutes is fully consistent with this ordinary English usage.").

The context here counsels an interpretation of the modifying scope of the term "substantial" that reaches all three terms in the series because that will avoid rendering (contrary to the drafters' clear intent) the second part of the special-skill test nigh surplusage and serve to define a subset of truly "special" skills that are worthy of an enhanced punishment. *See* 3 Singer, et al., *supra*, § 59:8 ("Although it is legitimate to consider the rules of sentence structure and grammar in interpreting statutes, the court's ultimate task is to interpret the statute in accordance with the intent of the legislature."); *cf. Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (Hand, J.) ("Of course it is true that the words

6

used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning."); *cf. also United States v. Hernandez*, 655 F.3d 1193, 1197 (10th Cir. 2011) ("Selectively enforcing a statute's plain terms is not something courts generally do, and something we cannot do in this case.").

Second, the term "usually" should be read to describe how one obtains the skill at issue. "Usually" means "more often than not." *Webster's Third New International Dictionary* 2524 (1981). Thus, the commentary should be interpreted to mean that, more often than not, one will need to undergo substantial education, training, or licensing to obtain the special skill. However, it is clear from our precedent that the term "usually" leaves room for the enhancement to apply in situations where the "defendant's special skill [was] derived from experience or from self-teaching." *United States v. Gandy*, 36 F.3d 912, 914 (10th Cir. 1994); *see United States v. Burt*, 134 F.3d 997, 999 (10th Cir. 1998) ("Although formalized education, training, or licensing is *usually* necessary to trigger the enhancement, we have held that special skills can be derived from experience or from self-teaching." (emphasis added)).

7

Following these legal principles, in a manner consistent with the reasoning of the Panel's opinion, I would uphold the district court's application of the special-skill enhancement in this case. Truck drivers do not categorically possess a special skill; some truck-driving skills will satisfy both parts of the test, while others will not.[2] Here, the district court's task was to determine whether Mr. Berry's truck-driving skills were sufficient to be deemed special. Because this is a question of fact, we review its decision under the highly deferential clear-error standard. *See United States v. Merriman*, 647 F.3d 1002, 1005 (10th Cir. 2011) ("Whether a defendant occupied a position of trust under Section 3B1.3 is generally a factual matter that we review only for clear error."); *see also United States v. Osborne*, 593 F.3d 1149, 1153–54 (10th Cir. 2010) (distinguishing between legal conclusions and factual determinations in reviewing the district court's upward departure under the Guidelines).

The district court did not clearly err in making its § 3B1.3 determination. The first requirement is certainly met: the ability to drive a commercial truck is

---

[2] For example, it is unlikely that a defendant who is driving a commercial truck for the first time when apprehended committing the offense and who possesses no truck-driving training or licensing would be deemed to possess a special skill within the meaning of § 3B1.3. Such a defendant would certainly possess a skill not possessed by members of the general public—the ability to drive a commercial truck—but he or she would be unlikely to possess the skill at such a high level that it usually would need to be obtained through substantial education, training, or licensing. Accordingly, this hypothetical defendant would not satisfy the second part of the two-part test.

8

not a skill possessed by the general public. *See United States v. Lewis*, 41 F.3d 1209, 1214 (7th Cir. 1994) ("Truck driving requires technical knowledge or ability that the average citizen does not possess."); *see also United States v. Mendoza*, 78 F.3d 460, 465 (9th Cir. 1996) ("[T]he driving of an 18-wheeler without any reported mishap over several years is a skill well beyond that possessed by the general public."). As to the second requirement, there was minimally sufficient evidence that Mr. Berry's truck-driving skills were of such a high level as to usually require substantial education, training, or licensing. Mr. Berry obtained a commercial driver's licence after one year of truck-driving school and on-the-job training, and he had approximately five and one-half years of truck-driving experience at the time of his arrest. A district court would not clearly err in finding that this level of training and experience indicated that Mr. Berry possessed the kind of skill that usually would require substantial education, training, or licensing to acquire. In other words, it would not clearly err in finding that Mr. Berry's skill qualified under the second part of the enhancement's test.

To be sure, it is beyond peradventure that the level of skill possessed by Mr. Berry is a far cry from that required to occupy the positions that the Guideline's commentary categorically qualifies for the enhancement—that is, "pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. § 3B1.3 cmt. n.4. However, as the Panel's opinion clearly

9

acknowledges, the drafters of § 3B1.3's commentary did not contemplate that they were providing a comprehensive or exhaustive list of occupations that would qualify for the special-skill enhancement. It also logically follows that they did not envision that district courts—when operating outside this rarefied, categorical zone—would be obliged to refrain from applying the enhancement unless they found defendants who possessed a matrix of education, training, and licensing that precisely correlated with the commentary's list of occupations. Such exactitude or symmetry is not required. In short, I cannot say that the district court clearly erred in concluding that Mr. Berry's truck-driving skills qualified him for the special-skill enhancement.

Because I read the Panel's opinion as being entirely consistent with the foregoing analysis, I fully concur in its ruling regarding the special-skill enhancement, as well as its ultimate determination to affirm the judgment of the district court.